IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

NOV  9 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:20-cr-250 |
| MOHAMED ABDALLA, | Count 1: Conspiracy to Offer and Pay Health Care Kickbacks (18 U.S.C. § 371) |
| Defendant. | Count 2: Conspiracy to Commit Health Care Fraud (18 U.S.C. § 1349) |
| | Criminal Forfeiture |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### General Allegations

At all times material to this Criminal Information:

1.      Mohamed Abdalla ("Abdalla") was a pharmacist licensed in the Commonwealth of Virginia.  Abdalla owned and operated MEDEX PHARMACY ("MEDEX"), MEDEX HEALTH PHARMACY ("MEDEX HEALTH"), MEDEX HEALTH GROUP, LLC, ("MEDEX HEALTH GROUP"), which did business as ROYAL CARE PHARMACY ("ROYAL CARE"), MILLENNIUM PHARMACY ("MILLENIUM"), and PHARMACY AT GREAT FALLS ("GREAT FALLS").  Finally, ABDALLA operated LANGLEY PHARMACY ("LANGLEY"). All of these pharmacies were located in the Eastern District of Virginia.   While in operation, these pharmacies filled prescriptions for patients' medications that were prescribed by numerous doctors and that were billed to various health insurance benefit programs.

2.      Since in and around March 2007, Mohammed Tariq Amin ("Amin") has been a licensed pharmacy technician in the Commonwealth of Virginia.   From in and about January 2015

to in and around January 2016, AMIN served as a pharmacy technician at MEDEX HEALTH. From in and around January 2016 to on or about November 7, 2018, Amin served as the general manager at ROYAL CARE.

3. Since in and around July 2018, Onkur Lal ("Lal") has been a licensed pharmacist with the Commonwealth of Virginia. Prior to becoming a pharmacist, from in and around 2013 to in and around 2015, Lal worked as a pharmacy technician at both MEDEX and MEDEX HEALTH. From in and around 2015 and continuing through at least in and around July 2018, Lal worked as a pharmacy intern at ROYAL CARE. From in and around July 2018 to in and around April 2019, Lal worked as a pharmacist at ROYAL CARE.

4. Since in and around June 2013, Unindicted Co-Conspirator 1 has been a licensed pharmacy technician in the Commonwealth of Virginia. From in and around 2015 and continuing through at least in and around April 2019, Unindicted Co-Conspirator 1 was the laboratory manager and compounding technician at ROYAL CARE. Unindicted Co-Conspirator 1 had a managerial role at GREAT FALLS. On or about May 21, 2015, Unindicted Co-Conspirator 1 purchased a 4 percent ownership stake in ROYAL CARE. On or about November 3, 2016, Unindicted Co-Conspirator 1 sold 1 percent of his ownership in ROYAL CARE to AMIN. This left Unindicted Co-Conspirator 1 with a 3 percent ownership stake in ROYAL CARE.

5. From in and around 2015 to in and around 2017, Dan Walker ("Walker") worked as a medical sales specialist for Pharmaceutical Company A, which is headquartered in the Eastern District of Virginia. Walker was responsible for marketing a naloxone auto-injector device used for the treatment of an opioid emergency. Walker marketed this naloxone auto-injector device to health care providers and pharmacies, such as ROYAL CARE.

6. ▆▆▆▆▆▆▆▆▆▆▆▆ was a physician specializing in orthopedic surgery, spine

2

surgery, physical therapy, and comprehensive pain management services. ███ owned a medical

practice called ███████████████████████ ███ has offices in Maryland and in the

Eastern District of Virginia.

7.    Seth Myers ("Myers") was a licensed attorney who operated a business called

Laboratory RX, LLC ("LABRX") on behalf of ██████████ controlled all of the revenue

generated by LABRX.

8.    ████████████████ was an obstetrician-gynecologist ("ob-gyn") who has

practiced in Northern Virginia since 1980. From at least in and around January 2014 to in and

around February 2017, ████ owned and operated a medical practice called ██████████

██████████ ████████████. In and around February 2017, ████ sold

███████████; however, he continued to practice there after selling the practice. In and

around November 2019, ████ left████████████ and started ████████

██████████████████, where he currently works. Both medical practices

are located in the Eastern District of Virginia.

9.    Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE are federal

health care programs funded directly, in whole or in part, by the United States Government, or a

state health care program, as defined by Title 42, United States Code, Section 1320a-7b(f).

Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE are also federal health care

programs as defined by Title 18, United States Code, Section 24(b).

10.    "Compounding" a prescription is a practice in which a licensed pharmacist or

licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a

drug tailored to the needs of an individual patient where standard medications, approved by the

United States Food and Drug Administration ("FDA") are unsuitable due to patient allergies,

3

intolerance to method of administration, or other uncommon factors. Compounded medications are prescribed and mixed for specific patients with particular needs; they are not to be mixed and marketed in bulk quantities. Compounded drugs are not FDA-approved. That is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

11.     In general, compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by Federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

## COUNT ONE

### *(Conspiracy to Offer and Pay Health Care Kickbacks)*

11.     The General Allegations are re-alleged and incorporated by reference.

12.     From a date unknown, but by at least in and around June 2014 and continuing through at least in and around February 2018, in the Eastern District of Virginia and elsewhere, MOHAMED ABDALLA knowingly and willfully did combine, conspire, confederate and agree with Mohammed Tariq Amin, Dan Walker, ███████████ Seth Myers, ███████████ and others known and unknown, to commit the following offense against the United States, that is, the violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to induce pharmaceutical sales representatives to direct health care providers and other individuals to send prescriptions to his pharmacies and to induce doctors to send prescriptions to his pharmacies for the furnishing of items and services for which payment may be made in whole or in part under a federal health care program.

### Purpose of the Conspiracy

13.     It was the purpose of the conspiracy for MOHAMED ABDALLA ("ABDALLA"), Mohammed Tariq Amin ("Amin"), Dan Walker ("Walker"), ███████████ Seth Myers ("Myers"), ███████████ and their co-conspirators to unlawfully enrich themselves.

### Ways, Manner, and Means

The ways, manners, and means by which ABDALLA and members of the conspiracy sought to achieve the purpose of the conspiracy included, but were not limited to, the following:

14. It was part of the conspiracy for ABDALLA, Amin, and their co-conspirators to cause kickbacks to be paid to pharmaceutical representatives, including Walker, in exchange for these representatives referring doctors who would direct prescriptions for certain drugs to be filled through ROYAL CARE.

15. It was further part of the conspiracy that ABDALLA and his co-conspirators, including Amin, submitted claims to federal health care programs for reimbursement for prescriptions that were directed to, and billed by, ROYAL CARE as a result of Walker's marketing efforts.

16. It was further part of the conspiracy that ABDALLA entered into a kickback arrangement with doctors, including ███ and ███ in which the doctors would refer prescriptions for expensive compound medications in exchange for a large percentage of the proceeds.

17. It was further part of the conspiracy that doctors, including ███ and ███ did refer prescriptions for expensive compound medications to pharmacies owned or operated by ABDALLA.

18. It was further part of the conspiracy that ABDALLA and his co-conspirators ran prescriptions for compound medications through insurance programs, including federal health care programs.

19. It was further part of the conspiracy that ABDALLA and his co-conspirators intentionally used ingredients in the compound medications with higher reimbursements to make more money.

## Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, ABDALLA and his co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

20. From in and around August 2016 through in and around October 2017, in the Eastern District of Virginia, ABDALLA and his co-conspirators, including Amin, made payments to Walker of approximately $573,558.46 from ABDALLA's MEDEX HEALTH GROUP bank accounts in exchange for prescriptions for a naloxone auto-injector device for which ROYAL CARE received reimbursement from health care benefit programs.

21. From in and around October 2017 through in and around September 2018, in the Eastern District of Virginia, ABDALLA and Amin made payments of approximately $132,347 to Walker through Amin's company, Innovative Pharmacy Solutions LLC, with the intent of concealing the income from Walker's spouse.

22. From in and around June 2017 through in and around June 2018, in the Eastern District of Virginia, Amin withdrew cash in the amount of approximately $70,823.78 from Amin's Innovative Pharmacy Solutions LLC bank account and used at least some of it to pay Walker in exchange for prescriptions for a naloxone auto-injector device directed to ROYAL CARE for which health care benefit programs paid ROYAL CARE, MILLENIUM, or GREAT FALLS.

23. From on or about August 1, 2016, through on or about February 28, 2018, ROYAL CARE, MILLENNIUM, and GREAT FALLS, received payments of approximately $8,465,015.29 collectively from Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE for claims submitted for prescriptions for this naloxone auto-injector device as a result of prescriptions directed to ROYAL CARE pursuant to the kickback relationship with WALKER.

7

24.     In and around late 2013, ▮ approached ABDALLA to determine if ABDALLA would be interested in a kickback arrangement in which ▮ would refer prescriptions for expensive compound medications to MEDEX HEALTH in exchange for a large percentage of the proceeds.

25.     In and around early 2014, ▮ instructed Myers to meet with ABDALLA and to show ABDALLA information about the profits made in similar schemes to convince ABDALLA to do business with them.  Initially, ABDALLA was not interested; however, once he saw the profits, he changed his mind.

26.     On or about May 20, 2014, ABDALLA and Myers, on behalf of LABRX, entered into a Marketing Agreement that documented the relationship and the negotiated profit split. Specifically, Myers agreed to provide "marketing" services for MEDEX HEALTH in exchange for fees.  In exchange, MEDEX HEALTH agreed to provide LABRX, "80% of the sales on all products sold to customers by the Area Manager . . . and 80% on all products sold by his/her subordinate marketing representatives."  There were never any discussions about actual marketing, and instead the parties understood that the agreement was solely for prescription referrals.

27.     From in and around July 2014 until in and around December 2015, in the Eastern District of Virginia and elsewhere, MEDEX HEALTH sent payments to LABRX for a total of approximately $2,573,323.45.   The payments were made pursuant to the kickback arrangement.

28.     During the course of the conspiracy, in the Eastern District of Virginia and elsewhere, TRICARE paid approximately $2,335,332.62 to MEDEX HEALTH for the prescriptions included in the kickback scheme, and paid ROYAL CARE approximately $2,152,978.12 for prescriptions included in the kickback scheme.  As such, TRICARE paid the

co-conspirators a total of approximately $4,488,310.74 pursuant to the kickback scheme.

29.     During the course of the conspiracy, in the Eastern District of Virginia and elsewhere, MEDEX HEALTH was paid a total of approximately $117,515.19 for prescriptions part of the kickback scheme.   MEDEX HEALTH was also paid approximately $39,638.61 from Virginia Medicaid during the period of the conspiracy.   As such, Medicare and Virginia Medicaid paid the co-conspirators a total of approximately $157,153.80 pursuant to the scheme.

30.     In and around 2014, in the Eastern District of Virginia, ABDALLA and ███ entered into a kickback arrangement in which ABDALLA agreed to pay ███ $100 per prescription sent to ABDALLA's pharmacies from ████████ .

31.     In and around 2014, in the Eastern District of Virginia, ABDALLA and ███ modified their kickback arrangement, and ABDALLA agreed to pay ███ $5,000 per month, with an understanding that there would be a reconciliation at the end of the year.   However, this reconciliation never happened.

32.     In and around 2014, in the Eastern District of Virginia, ABDALLA paid ███ with checks totaling $12,700 from MEDEX HEALTH GROUP.

33.     From in and around March 2015 until September 2017, ABDALLA caused ███ to be paid $155,000 in cash.

34.     In and around August 2018, ABDALLA caused ███ to be paid $3,000 in cash.

(All in violation of Title 18, United States Code, Section 371)

## COUNT TWO

### (*Conspiracy to Commit Health Care Fraud*)

35.     The General Allegations are re-alleged and incorporated by reference.

36.     From a date unknown, but from at least in and around January 2015 and continuing through at least in and around November 2018, in the Eastern District of Virginia and elsewhere, ABDALLA knowingly and willfully did combine, conspire, confederate and agree with Mohammed Tariq Amin, Onkur Lal, and others known and unknown, to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including, but not limited to Medicare, Virginia Medicaid, Maryland Medicaid, TRICARE, Anthem BlueCrossBlueShield, CareFirst BlueCross BlueShield, Aetna, and United Healthcare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, all in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

37.     It was the purpose of the conspiracy for ABDALLA, Amin, Lal, and their co-conspirators to unlawfully enrich themselves.

### Ways, Manner, and Means

The ways, manners, and means by which ABDALLA and members of the conspiracy sought to achieve the purpose of the conspiracy included, but were not limited to, the following:

38.     It was part of the conspiracy for co-conspirators to generate false prescriptions using either their own names, the names of other pharmacy employees, or the names of friends

and family, for medications which they had no basis to believe were medically necessary and/or which were not authorized by any licensed medical practitioner.

39.     It was further part of the conspiracy that the co-conspirators billed health insurance companies for prescriptions that were never filled for existing patients.

40.     It was further part of the conspiracy that the co-conspirators billed patients' health care benefits programs for numerous high cost medications that the co-conspirators knew the patients did not need, were not prescribed, and/or never received.

41.     It was further part of the conspiracy that the co-conspirators submitted false invoices, under the names of other pharmacies, to circumvent audits conducted of ROYAL CARE.

42.     It was further part of the conspiracy that ABDALLA and Amin billed private health care benefit programs for prescriptions the pharmacies were receiving pursuant to a kickback arrangement with Walker.

43.     It was further part of the conspiracy that Lal and Amin fraudulently posed as pharmacists by elevating their title and credentials within the pharmacy's prescription software system.

44.     It was further part of the conspiracy that Lal and Amin used the elevated titles to verify prescriptions, which were then submitted to health care programs and pharmaceutical suppliers for payment.

45.     It was further part of the conspiracy that the co-conspirators caused the submission of false, fraudulent, and misleading claims for coupons intended to provide payment benefits/assistance to patients who needed certain pharmaceutical products.

46.     It was further part of the conspiracy that the co-conspirators created fictitious patients in the system in order to fraudulently obtain payment for ROYAL CARE pursuant to the

coupon programs.

Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, ABDALLA and his co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

47.    On or about December 16, 2018, in the Eastern District of Virginia, Lal wrote a fraudulent prescription for himself for an opioid antidote. Lal wrote on the prescription that a known doctor prescribed the medication, which was not true. This prescription was then fraudulently submitted for reimbursement from a health care benefit program.

48.    From in and around January 2014 and continuing through at least in and around March 2019, ABDALLA, Amin, Lal, and Unindicted Co-Conspirator 1, generated false prescriptions using either their own names, the names of other pharmacy employees, or the names of friends and family, for medications that were not medically necessary and/or which were not authorized by a licensed medical practitioner.

49.    The co-conspirators were paid approximately $245,069.76 for this scheme for prescriptions that were fraudulently billed.

50.    From in and around January 2014 and continuing through at least in or around April 2019, in the Eastern District of Virginia and elsewhere, ABDALLA and the co-conspirators billed heath care benefit programs for high-cost medications when the patients did not need the prescriptions, the medications were not prescribed, and/or the patients never received the medications.

51.    The co-conspirators were paid approximately $4,876,688.96 for this scheme for prescriptions that were fraudulently billed.

12

52.     From in and around August 2016 to in and around February 2018, CareFirst BlueCross/BlueShield paid the pharmacies $5,643,440 for prescriptions for the naloxone auto-injector device that Walker referred to ABDALLA's pharmacies as part of the kickback scheme.

53.     From in and around August 2016 to in and around February 2018, Anthem BlueCross/BlueShield paid the pharmacies $2,500,709.00 for prescriptions for the naloxone auto-injector device that Walker referred to ABDALLA's pharmacies as part of the the kickback scheme.

54.     From in and around November 2015 to in and around October 2017, in the Eastern District of Virginia and elsewhere, Lal and Amin elevated their credentials from pharmacy technician to pharmacist, a license neither of them held at the time in the Commonwealth of Virginia.

55.     From in and around November 2015 to in and around October 2017, in the Eastern District of Virginia and elsewhere, Lal and Amin used their elevated pharmacist titles to verify prescriptions, which were then submitted to health care benefit programs and pharmaceutical suppliers for payment.

56.     From in and around November 2015 to in and around October 2017, health care benefit programs paid approximately $10,196,878 to the co-conspirators, as a result of Lal and Amin fraudulently posing as pharmacists.

57.     From in and around December 2015 to in or around November 2017, in the Eastern District of Virginia and elsewhere, Lal and the co-conspirators causing the submission of false, fraudulent, and misleading claims for coupons intended to provide payment benefits/assistance to patients who needed certain pharmaceutical products.

58. From in and around December 2015 to in or around November 2017, in the Eastern District of Virginia and elsewhere, Lal and the co-conspirators created fictitious patients in the RX30 system in order to fraudulently obtain payment for ROYAL CARE pursuant to the coupon programs.

(All in violation of Title 18, United States Code, Section 1349)

# NOTICE OF FORFEITURE

Defendant MOHAMED ABDALLA is hereby notified, pursuant to Federal Rule of Criminal Procedure 32.2(a), that upon conviction of either of the offenses set forth in this Criminal Information, he shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violation.

The assets subject to forfeiture include, but are not limited to, the following: a monetary judgment in the amount of not less than $2,354,803.90, representing the proceeds the defendant obtained from the conspiracies charged in this Criminal Information.

Pursuant to 21 U.S.C. § 853(p), MOHAMED ABDALLA shall forfeit substitute property, if, by any act or omission of MOHAMED ABDALLA, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(All in accordance with Title 18, United States Code, Sections 982(a)(7) and Fed. R. Crim. P. 32.2.)

G. Zachary Terwilliger
United States Attorney

By:  _____
Carina A. Cuellar
Monika Moore
Assistant United States Attorneys