IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
FILED
IN OPEN COURT

NOV  9 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO.1:20-CR-250 |
| v. | Count 1: Conspiracy to Offer and Pay Health Care Kickbacks (18 U.S.C. § 371) |
| MOHAMED ABDALLA, | |
| Defendant. | Count 2: Conspiracy to Commit Health Care Fraud (18 U.S.C. § 1349) |

## STATEMENT OF FACTS

The United States and the defendant, MOHAMED ABDALLA ("ABDALLA"), stipulate that the allegations in the Criminal Information and the following facts are true and correct. The United States and ABDALLA further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

### I.  Introduction

1.  Since in and around May 2008, ABDALLA has been a pharmacist licensed in the Commonwealth of Virginia. ABDALLA owned MEDEX PHARMACY ("MEDEX"), which was located in McLean, Virginia, with A.H. and R.H. A.H. was the listed partner at MEDEX and R.H. financed a 50% share of the pharmacy. At all relevant times, ABDALLA also owned MEDEX HEALTH PHARMACY ("MEDEX HEALTH"), which was located in Falls Church, Virginia. Later, ABDALLA opened MEDEX HEALTH GROUP, LLC, ("MEDEX HEALTH GROUP"), which did business as ROYAL CARE PHARMACY ("ROYAL CARE"), and was located in Fairfax, Virginia. Additionally, ABDALLA owned MILLENNIUM PHARMACY ("MILLENIUM"), which was located in Falls Church, Virginia, with S.H., who is a physician, and he owned PHARMACY AT GREAT FALLS ("GREAT FALLS"), which was located in Great

Falls, Virginia, with L.V., his parent-in-law.   L.V. was listed as the owner of GREAT FALLS to conceal ABDALLA's operating role in the pharmacy.   Finally, ABDALLA operated LANGLEY PHARMACY ("LANGLEY"), which was located in Fairfax, Virginia.   The owner of LANGLEY was listed as A.E., ABDALLA's brother-in-law.   Again, A.E. was listed as the owner of LANGLEY to conceal ABDALLA's operating role in the pharmacy.   All of these pharmacies are located in the Eastern District of Virginia.   While in operation, these pharmacies filled prescriptions for patients' medications that were prescribed by numerous doctors and that were billed to various health insurance benefit programs.

2.   Since in and around March 2007, TARIQ AMIN ("AMIN") has been a licensed pharmacy technician in the Commonwealth of Virginia.   From in and about January 2015 to in and around January 2016, AMIN served as a pharmacy technician at MEDEX HEALTH.   From in and around January 2016 to on or about November 7, 2018, AMIN served as the general manager at ROYAL CARE.   AMIN had an informal managerial role at MILLENNIUM during his tenure at ROYAL CARE.   As the general manager at ROYAL CARE, AMIN was responsible for overseeing, controlling, and managing the day-to-day operations of the pharmacy.   In 2016, AMIN acquired a 1.5 percent ownership stake in ROYAL CARE.

3.   Since in and around July 2018, ONKUR LAL ("LAL") has been a licensed pharmacist with the Commonwealth of Virginia.   Prior to becoming a pharmacist, from in and around 2013 to in and around 2015, LAL worked as a pharmacy technician at both MEDEX and MEDEX HEALTH.   From in and around 2015 and continuing through at least in and around July 2018, LAL worked as a pharmacy intern at ROYAL CARE.   From in and around July 2018 to in and around April 2019, LAL worked as a pharmacist at ROYAL CARE.   On or about May 29, 2015, LAL purchased a 5 percent ownership stake in ROYAL CARE.   On or about November 4,

2016, LAL sold 0.5 percent of his ownership in ROYAL CARE to AMIN. This left LAL with a 4.5 percent ownership stake in ROYAL CARE.

4.      Since in and around June 2013, Unindicted Co-Conspirator 1 has been a licensed pharmacy technician in the Commonwealth of Virginia. From in and around 2015 and continuing through at least in and around April 2019, Unindicted Co-Conspirator 1 was the laboratory manager and compounding technician at ROYAL CARE. Unindicted Co-Conspirator 1 had a managerial role at GREAT FALLS. On or about May 21, 2015, Unindicted Co-Conspirator 1 purchased a 4 percent ownership stake in ROYAL CARE. On or about November 3, 2016, Unindicted Co-Conspirator 1 sold 1 percent of his ownership in ROYAL CARE to AMIN. This left Unindicted Co-Conspirator 1 with a 3 percent ownership stake in ROYAL CARE.

5.      From in and around 2015 to in and around 2017, DAN WALKER ("WALKER") worked as a medical sales specialist for PHARMACEUTICAL COMPANY A, which is headquartered in the Eastern District of Virginia. WALKER was responsible for marketing a naloxone auto-injector device used for the treatment of an opioid emergency. WALKER marketed this naloxone auto-injector device to health care providers and pharmacies, such as ROYAL CARE. In and around February 2016, PHARMACEUTICAL COMPANY A raised the price of this naloxone auto-injector device to over $3,000 per unit, which included two auto-injectors and a training device.

6.      ████████████████████ was a physician specializing in orthopedic surgery, spine surgery, physical therapy, and comprehensive pain management services. ████ owned a medical practice called ██████████████████. ████ has offices in Maryland and in the Eastern District of Virginia.

7.      SETH MYERS was a licensed attorney who operated a business called Laboratory

3

RX, LLC ("LABRX") on behalf of ▇▇▇▇▇▇▇▇ controlled all of the revenue generated by LABRX.

## II.    The Conspiracy to Violate the Anti-Kickback Statute

8.      Medicare, Virginia Medicaid, Maryland Medicaid, and Tricare ("TRICARE") are federal health care programs funded directly, in whole or in part, by the United States Government, or a state health care program, as defined by Title 42, United States Code, Section 1320a-7b(f). Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE are also federal health care programs as defined by Title 18, United States Code, Section 24(b).

9.      TRICARE is a health insurance program of the United States Department of Defense.  TRICARE provides civilian health insurance benefits for military personnel, military retirees, reservists, and military dependents all around the world.  There are two types of beneficiaries under the TRICARE program: (a) Sponsors — active duty, retired and guard/reserve members; and (b) Family Members — spouses and children who are registered in the Defense Enrollment Eligibility Reporting System ("DEERS").

10.     Medicare was established under Title XVIII of the Social Security Act and provides benefits to persons who are sixty-five years of age or older, or disabled.  Medicaid was established under Title XIX of the Social Security Act.  All states, the District of Columbia, and the U.S. territories have Medicaid programs designed to provide health coverage for low-income people. Although the federal government establishes certain parameters for all states to follow, each state administers their Medicaid program differently, resulting in variations in Medicaid coverage across the country.

11.     In order to pay a claim, TRICARE requires that the item or service being billed must be medically necessary, properly prescribed by a licensed physician, and actually provided to a TRICARE beneficiary.

4

12.    32 CFR Part 199 regulates the TRICARE program. 32 CFR § 199.9(c)(12) defines fraud as, among other things, "[a]rrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the [Civilian Health and Medical Program of the Uniformed Services] through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits." TRICARE considers a claim resulting from a violation of 32 CFR § 199.9 as false and TRICARE would not pay for these items or services.

13.    From a date unknown, but by at least in and around June 2014 and continuing through at least in and around February 2018, in the Eastern District of Virginia and elsewhere, ABDALLA knowingly and willfully did combine, conspire, confederate and agree with AMIN, WALKER, ███████ MYERS, ██████ and others known and unknown, to commit the following offense against the United States, that is, the violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to induce pharmaceutical sales representatives to direct health care providers and other individuals to send prescriptions to his pharmacies and to induce doctors to send prescriptions to his pharmacies for the furnishing of items and services for which payment may be made in whole or in part under a federal health care program.

a.  *Kickbacks to Pharmaceutical Sales Representatives for the Naloxone Auto-Injector Device*

14.    During the conspiracy, ABDALLA and his co-conspirators, including AMIN, caused kickbacks to be paid to pharmaceutical representatives in exchange for these representatives referring doctors who would direct prescriptions for certain drugs to be filled through ROYAL CARE. The co-conspirators disguised the kickback payments using various

5

means.

15.     For instance, during the conspiracy, ABDALLA and his co-conspirators, including AMIN and WALKER, entered into a contract whereby ROYAL CARE would compensate WALKER 25% of all net sales for every prescription of this naloxone auto-injector device that WALKER directed to ROYAL CARE, and for which the pharmacy received reimbursement from health care benefit programs.   On behalf of ABDALLA, AMIN paid another PHARMACEUTICAL COMPANY A sales representative, M.E., $1,000.00 as a "thank you" for connecting ROYAL CARE with WALKER.   ABDALLA's pharmacies distinguished themselves from their competitors in providing prescriptions for this naloxone auto-injector device to patients because of their willingness to handle prior authorizations on behalf of physicians.

16.     From in and around August 2016 through in and around October 2017, ABDALLA and his co-conspirators, including AMIN, made payments to WALKER of approximately $573,558.46 from ABDALLA's MEDEX HEALTH GROUP bank accounts in exchange for prescriptions for this naloxone auto-injector device for which ROYAL CARE received reimbursement from health care benefit programs.

17.     From in and around October 2017 through in and around September 2018, ABDALLA and AMIN made payments of approximately $132,347 to WALKER through AMIN's company, Innovative Pharmacy Solutions LLC, with the intent of concealing the income from WALKER's spouse.   These payments to WALKER were his 25% portion of the net income received by ROYAL CARE from health care benefit programs for prescriptions for this naloxone auto-injector device.   AMIN kept for himself a portion of the fees that were intended for WALKER pursuant to the kickback arrangement.

18.     From in and around June 2017 through in and around June 2018, AMIN withdrew

6

cash in the amount of approximately $70,823.78 from AMIN's Innovative Pharmacy Solutions LLC bank account and used at least some of it to pay WALKER in exchange for prescriptions for this naloxone auto-injector device directed to ROYAL CARE for which health care benefit programs paid ROYAL CARE, MILLENIUM, or GREAT FALLS.

19.     During the conspiracy, ABDALLA and his co-conspirators, including AMIN, submitted claims to federal health care programs for reimbursement for prescriptions for this naloxone auto-injector device that were directed to, and billed by, ROYAL CARE as a result of WALKER's marketing efforts. The federal health care programs paid ABDALLA and his co-conspirators for these prescriptions.

20.     As described in detail below, in addition to the scheme involving illegal kickbacks for this naloxone auto-injector device, ABDALLA was involved in various other illegal health care schemes. When payments that overlap with other fraudulent activity are factored out, during the conspiracy, from on or about August 1, 2016, through on or about February 28, 2018, ROYAL CARE, MILLENNIUM, and GREAT FALLS, received payments of approximately $8,465,015.29 collectively from Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE for claims submitted for prescriptions for this naloxone auto-injector device as a result of prescriptions directed to ROYAL CARE pursuant to the kickback relationship with WALKER. During this period, ROYAL CARE, MILLENNIUM, and GREAT FALLS were paid as if they dispensed 1,849 dual pack boxes of this naloxone auto-injector device. The average retail cost of this naloxone auto-injector device during this time was $3,762.65. Thus, a conservative estimate of the amount ROYAL CARE, MILLENNIUM, and GREAT FALLS profited is approximately $1,507,877.44 from these prescriptions for this naloxone auto-injector device. ABDALLA's 75% share of this amount would be $1,130,908.08.

    *b.  Kickbacks for Referrals of Compound Prescriptions to* ▮▮▮ *and MYERS*

21.    In and around late 2013, ▮▮▮ approached ABDALLA to determine if ABDALLA would be interested in a kickback arrangement in which ▮▮▮ would refer prescriptions for expensive compound medications to MEDEX HEALTH in exchange for a large percentage of the proceeds. ▮▮▮ told ABDALLA that he worked with numerous TRICARE patients.  Compounding a prescription is a practice in which a licensed pharmacist or licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA"), are unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors.  Compounded medications are prescribed and mixed for specific patients with particular needs; they are not to be mixed and marketed in bulk quantities.  Compounded drugs are not FDA-approved.  That is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

22.    Compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs. ▮▮▮ MYERS, and ABDALLA knew that many health insurance programs were paying pharmacies large amounts of money for compounds at the time, and that TRICARE generally paid the most.

23.    ▮▮▮ instructed MYERS to meet with ABDALLA and to show ABDALLA information about the profits made in similar schemes to convince ABDALLA to do business with them.  Initially, ABDALLA was not interested; however, once he saw the profits, he changed his mind.  MYERS told ABDALLA that he could increase ABDALLA's revenues by $1 million per month.  ABDALLA and MYERS, on behalf of ▮▮▮ ultimately agreed to a profit split of 80%

for ███████ through LABRX and 20% for ADBALLA.  On or about May 20, 2014, ABDALLA and MYERS, on behalf of LABRX, entered into a Marketing Agreement that documented the relationship and the negotiated profit split.  Specifically, MYERS agreed to provide "marketing" services for MEDEX HEALTH in exchange for fees.  MYERS agreed to "devote such time, energy and skill on a regular and consistent basis as is necessary to solicit orders and promote the sale of MEDEX HEALTH's products."  In exchange, MEDEX HEALTH agreed to provide LABRX, "80% of the sales on all products sold to customers by the Area Manager . . . and 80% on all products sold by his/her subordinate marketing representatives."  There were never any discussions about actual marketing, and instead the parties understood that the agreement was solely for prescription referrals.

24.  Once the arrangement was finalized, MYERS provided ABDALLA with a pre-printed prescription pad that ███████ had used in the past.  ABDALLA began running prescriptions through insurance programs and adjusting them to reflect the formulas that paid the most money.  ███████ and ABDALLA intentionally used ingredients with higher reimbursements to make more money, and ███████ gave final approval for the prescription pads, knowing that the combination of the listed ingredients reimbursed at a higher rate than other equally functional ingredients.  ███████ also instructed ABDALLA to waive patient co-payments in certain instances because the co-conspirators were making so much money based on what insurance would reimburse for the prescriptions.  ███████ and MYERS further instructed ABDALLA to provide compound dispensing reports to track the number of prescriptions sent to MEDEX pursuant to the conspiracy.  The first time that ABDALLA completed one of these reports, he emailed it to ███████ and MYERS, but ███████ then instructed ABDALLA to only send these reports to MYERS.  MYERS told ABDALLA that he was recruiting doctors in other

states and encouraged ABDALLA to get pharmacy licenses in other states, but ABDALLA never did this because it takes a long time to obtain the licenses.

25.     Around the beginning of 2014, the profit margins for the drugs ▮▮▮▮▮ was prescribing that MEDEX HEALTH was dispensing were as high as $25,000 and as low as $600. The amount depended on the insurance company and the patient's insurance group number.

26.     During the kickback arrangement with ABDALLA, ▮▮▮▮▮ wrote increasingly more compound prescriptions.  As part of the kickback arrangement, other individuals at ▮▮▮▮▮ and other doctors that ▮▮▮▮▮ and MYERS recruited, including Dr. A.D. and Dr. A.C. in Georgia, sent prescriptions to MEDEX HEALTH.   MYERS also introduced ABDALLA to a sales representative named T.F. who facilitated a similar arrangement with two podiatrists, Dr. R.T. and Dr. V.B. in Virginia.  ABDALLA sent payments for the prescriptions referred by ▮▮▮▮▮ and the other doctors at ▮▮▮▮▮ in the form of checks addressed to LABRX and mailed to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which was an office building owned by ▮▮▮▮▮ Payments for the other doctors referred by MYERS were paid via different company names, but still under the terms of the agreement negotiated by MYERS.   These checks were written to HANOVER MEDICAL, a business owned by ▮▮▮▮▮

27.     At some point in the conspiracy, ABDALLA informed ▮▮▮▮▮ and MYERS that the health insurance programs were no longer paying as much money for compound medications, but the co-conspirators continued the arrangement, profiting on the amounts the insurance programs did pay.  Specifically, ABDALLA told ▮▮▮▮▮ that TRICARE was no longer paying for the compounded medications and they would only profit about $600 per prescription.  ▮▮▮▮▮ responded with something to the effect of, "$600 is better than nothing."   Eventually, the relationship between ABDALLA and ▮▮▮▮▮ started to deteriorate.

28.     Around the same time, ███████ learned from several patients that the patients'
prescriptions, which had originally been sent to MEDEX HEALTH, were filled at other
pharmacies owned by ABDALLA.   Eventually, at ███████ request, MYERS filed a lawsuit for
money ███████ believed that ABDALLA owed under the Marketing Agreement.   ███████ and
MYERS ultimately stopped referring prescriptions to ABDALLA.

29.     During the time of the conspiracy, MEDEX HEALTH sent at least the following
payments to LABRX for a total of approximately $2,573,323.45.

| Check Number/Wire Ref# | Check Date | From | To | Amount |
|---|---|---|---|---|
| 1053 | 07/18/2014 | Medex Health LCC | Laboratory RX | $135,200.00 |
| 1055 | 07/23/2014 | Medex Health LCC | Laboratory RX | $55,315.30 |
| 1076 | 08/22/2014 | Medex Health LCC | Laboratory RX | $288,720.00 |
| 1112 | 09/25/2014 | Medex Health LCC | Laboratory RX | $213,375.90 |
| 1145 | 10/24/2014 | Medex Health LCC | Laboratory RX | $259,894.82 |
| 1192 | 11/28/2014 | Medex Health LCC | Laboratory RX | $157,863.23 |
| 1244 | 01/05/2015 | Medex Health LCC | Laboratory RX | $127,634.71 |
| 1266 | 01/26/2015 | Medex Health LCC | Laboratory RX | $205,343.92 |
| 1301 | 02/25/2015 | Medex Health LCC | Laboratory RX | $165,980.82 |
| 1318 | 03/25/2015 | Medex Health LCC | Laboratory RX | $194,900.00 |
| 1320 | 03/25/2015 | Medex Health LCC | Laboratory RX | $2,039.85 |
| 1359 | 04/26/2015 | Medex Health LCC | Laboratory RX | $191,274.84 |
| 1392 | 05/26/2015 | Medex Health LCC | Laboratory RX | $206,380.77 |
| 1400 | 06/03/2015 | Medex Health LCC | Laboratory RX | $3,997.80 |

11

| Check Number/Wire Ref# | Check Date | From | To | Amount |
|---|---|---|---|---|
| 1424 | 07/08/2015 | Medex Health LCC | Laboratory RX | $71,069.76 |
| 1442 | 07/08/2015 | Medex Health LCC | Laboratory RX | $18,424.60 |
| 1490 | 08/17/2015 | Medex Health LCC | Laboratory RX | $22,147.73 |
| 1546 | 09/22/2015 | Medex Health LCC | Laboratory RX | $35,251.21 |
| 1577 | 10/21/2015 | Medex Health LCC | Laboratory RX | $23,153.75 |
| 1032 | 11/17/2015 | Medex Health LCC | Laboratory RX | $70,337.42 |
| 1049 | 12/22/2015 | Medex Health LCC | Laboratory RX | $14,890.84 |
| 1050 | 12/22/2015 | Medex Health LCC | Laboratory RX | $110,126.18 |

30.     In total, TRICARE paid approximately $2,335,332.62 to MEDEX HEALTH for the prescriptions included in the kickback scheme, and paid ROYAL CARE approximately $2,152,978.12 for prescriptions included in the kickback scheme.  As such, TRICARE paid the co-conspirators a total of approximately $4,488,310.74 pursuant to the kickback scheme.

31.     MEDEX HEALTH made a net profit of approximately $2,208,602.12 and ROYAL CARE made a net profit of approximately $953,054.92 from payments made by TRICARE for compound prescriptions that were part of the kickback scheme, after estimated expenses are deducted.   In total, the co-conspirators received a total net profit of approximately $3,161,657.04. ABDALLA did not end up providing LABRX with the 80% of the profits for prescriptions sent to ROYAL CARE and instead only paid LABRX approximately $195,354.44.   As such, ABDALLA's share of the net profits paid pursuant to the scheme was approximately $1,119,420.90.

32.     For the TRICARE prescriptions that MEDEX HEALTH received pursuant to the

12

kickback scheme, the pharmacy received a total of approximately $11,725.91 in co-payments from TRICARE patients and ROYAL CARE received approximately $10,928.00 in co-payments from TRICARE patients.  Pursuant to the arrangement with MEDEX HEALTH, LABRX received approximately $18,123.13 of these co-payments that TRICARE patients paid.

33.     For Medicare prescriptions that MEDEX HEALTH received pursuant to the kickback scheme, the pharmacy was paid a total of approximately $117,515.19.  MEDEX HEALTH was also paid approximately $39,638.61 from Virginia Medicaid during the period of the conspiracy.  As such, Medicare and Virginia Medicaid paid the co-conspirators a total of approximately $157,153.80 pursuant to the scheme.  For Medicare prescriptions that ROYAL CARE received pursuant to the kickback scheme, the pharmacy was paid a total of approximately $4,295.20.

34.     During the period of the conspiracy, MEDEX HEALTH made a net profit of approximately $118,079.40 and ROYAL CARE made a net profit of approximately $4,295.20 from payments made by Medicare and Virginia Medicaid for compound prescriptions that were part of the kickback scheme.  As such, the co-conspirators received a total net profit of approximately $122,374.60 pursuant to the scheme.  ABDALLA's 20% share of these proceeds was approximately $24,474.92.

35.     For the Medicare and Virginia Medicaid prescriptions that MEDEX HEALTH received pursuant to the kickback scheme, the pharmacy received a total of approximately $19,704.97 in co-payments.  ROYAL CARE received approximately $878.29 in co-payments from Medicare patients.  Pursuant to the arrangement with MEDEX HEALTH, LABRX received approximately $16,466.60 of these co-payments that Medicare and Virginia Medicaid beneficiaries paid.

   c. *Kickbacks for Referrals of Compound Prescriptions and Other Medications to Other Doctors*

36.    During the relevant time period, ABDALLA was approached by a doctor (hereinafter "Doctor 1"), a physician at MEDICAL PRACTICE 1.   Doctor 1 was looking to engage in an arrangement where he would receive kickbacks from ABDALLA for compound medications and other prescriptions referred to ABDALLA.   At the time, ABDALLA knew that this arrangement was a violation of federal law.   Doctor 1 wanted 40% of the profits sent to his company.   Doctor 1 indicated that ABDALLA could have all of the prescriptions from MEDICAL PRACTICE 1, owned by ███████ ██ but only if ABDALLA paid Dr. ███ $100 per prescription.   Prescriptions sent from MEDICAL PRACTICE 1 to ABDALLA included prescriptions sent from Doctor 1 and Dr. ███ and prescriptions sent from other professionals at the practice, including Doctor 2 and Nurse-Midwife 1.   Nurse-Midwife 1 and Doctor 2 wrote most of the prescriptions from MEDICAL PRACTICE 1.   In addition to compound medications, prescriptions for DermacinRX, Diclofenac, Duexis, Fluocinonide, Ortho D, Pennsaid, and Vimovo among others, were part of the kickback scheme.   These medications became part of the kickback scheme because insurance payers reimbursed for them at the highest rates.

37.    Pursuant to this arrangement, ABDALLA paid Doctor 1 $110,000 in 2014, $1,444,100 in 2015 and $863,750.92 in 2016.   MEDEX HEALTH GROUP paid Dr. ███ $2,400 in December 2014, $5,300 in January 2015, and $5,000 in February 2015.   At the beginning of the scheme, ABDALLA wrote Dr. ███ a check in the amount of $7,000 and gave it to Doctor 1 to provide to Dr. ███   Doctor 1 ultimately told ABDALLA that Dr. ███ needed to be paid in cash.   ABDALLA believed that the request for a cash payment was to avoid any record of payment.   ABDALLA then began making payments to Dr. ███ in cash but it soon became too cumbersome to calculate how much was owed using the $100 per prescription

14

calculation, so Doctor 1 suggested that ABDALLA pay Dr. ▮▮▮ $5,000 per month in cash as a flat fee, with a year-end reconciliation.   The year-end reconciliation never occurred and ABDALLA just paid Dr. ▮▮▮ $5,000 per month.   To make the payments to Dr. ▮▮▮ ABDALLA sent Dr. ▮▮▮ a bag each month, which contained compound medications for use in a cosmetic service at Dr. ▮▮▮ practice.   Beneath the medication was the $5,000 cash payment. In the beginning, ABDALLA delivered the bag to Dr. ▮▮▮ to formalize the arrangement but later AMIN, ABDALLA's pharmacy technicians, or ABDALLA's delivery person delivered the package.   During one meeting at Dr. ▮▮▮ office with ABDALLA, Nurse-Midwife 1 was present and made a comment to the effect of the following: "I'm the one writing all these scripts, so I'll be the one that ends up going to jail."

38.     In mid-2016, Doctors 1 and 2 left MEDICAL PRACTICE 1 to create their own practice and the prescriptions from MEDICAL PRACTICE 1 declined substantially.   ABDALLA still paid Dr. ▮▮▮ the $5,000 flat fee for compounded prescriptions until the fall of 2017.   While ABDALLA did not formally terminate his agreement with Dr. ▮▮▮ he stopped sending the monthly payment.   Dr. ▮▮▮ contacted ABDALLA in 2018 about several new schemes such as providing allergy shots for a Managed Service Organization and giving Dr. ▮▮▮ a kickback from these payments, but an agreement was never reached to pursue these schemes.

39.     ABDALLA continued his prior kickback arrangement with Doctor 1 after Doctors 1 and 2 opened their own practice, MEDICAL PRACTICE 2.   Doctor 1 instructed ABDALLA to fill the prescriptions in the name of Doctor 2.   Once Doctor 1 opened MEDICAL PRACTICE 2, there were less profits to share due to the medications the new practice prescribed.

40.     The parties agree that total losses to the United States pursuant to the anti-kickback schemes were between $3,500,000 and $9,500,000.

### III.   Conspiracy to Commit Health Care Fraud

41.    From a date unknown, but from at least in and around January 2015 and continuing through at least in and about November 2018, in the Eastern District of Virginia and elsewhere, ABDALLA knowingly and willfully did combine, conspire, confederate and agree with AMIN, LAL, Co-Conspirator 1, and others known and unknown, to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including, but not limited to Medicare, Virginia Medicaid, Maryland Medicaid, TRICARE, Anthem BlueCrossBlueShield, CareFirst BlueCross BlueShield, Aetna, and United Healthcare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, all in violation of Title 18, United States Code, Section 1347.

> a. *Fraudulently Billing Fake Prescriptions in the Names of Friends, Colleagues, and Family Members*

42.    From in and around January 2015 through in and around November 2018, the fraud conspiracy entailed ABDALLA and his co-conspirators, including AMIN, LAL and Unindicted Co-Conspirator 1, generating false prescriptions in the pharmacy's prescription software system known as RX30 using either their own names, the names of other pharmacy employees, or the names of friends and family, for medications which they had no basis to believe were medically necessary and/or which were not authorized by any medical practitioner.   ABDALLA and the other co-conspirators would submit claims for these false prescriptions to health care benefit programs seeking payment for the false prescriptions with the intent to boost revenue for the pharmacy.   In addition, these actions benefitted the co-conspirators by helping them to exhaust

their personal health insurance deductibles, even though they were not actually paying the co-payments or out-of-pocket costs for the medications.

43.     During the conspiracy, when payments that overlap with other fraudulent activity are factored out, the co-conspirators received payments of approximately $1,885,152 from health care benefit programs for drugs billed in the co-conspirators' own names, the names of other pharmacy employees, and the names of friends and family.   Based on a very conservative estimate, approximately 13% of these payments were for fraudulent prescriptions involved in this scheme.   As such, the co-conspirators were paid approximately $245,069.76 for this scheme for prescriptions that were fraudulently billed.

### b. Billing for Other Prescriptions Never Prescribed and/or Authorized

44.     From in and around January 2014 to in and around November 2018, the co-conspirators also enriched themselves by defrauding health care benefit programs by causing the submission of additional false, fraudulent, and misleading claims.   ABDALLA often directed the pharmacy employees, including AMIN and LAL, to "run everything" for patients, meaning the co-conspirators should bill the patients' health care benefit programs for numerous high cost medications, which the co-conspirators knew the health benefits programs would reimburse.   This occurred even when the patients did not need the prescriptions, were not prescribed the medications, and/or never received the medications.   For instance, the co-conspirators billed health insurance companies for prescriptions that were never filled for existing patients, including prescriptions for Red Alaskan Algae, Pennsaid, Duexis, Vimovo, DermacinRx, Lexitral, DermacinRx SilaPak, Alcortin A, and the naloxone auto-injector device.   On some occasions, the pharmacy would send the unnecessary drugs to the patients.   When this occurred, the patients often complained when they received a prescription they did not need, but these patients were satisfied if the pharmacy accepted the return of the product.   At times, the co-conspirators used

unique keywords or phrases, which only they knew, such as "sauciate," in the pharmacy records to indicate which refills were going to be fraudulent.

45.     In particular, the co-conspirators, including ABDALLA, knew that Red Alaskan Algae was a very expensive ingredient used in compound prescriptions. As such, the co-conspirators often fraudulently billed for compounds allegedly containing this ingredient. AMIN and LAL processed these prescriptions. At one point during the conspiracy, the pharmacy did not have any Red Alaskan Algae on hand due to a backorder. As the laboratory manager and primary compounding technician at the pharmacy, Unindicted Co-Conspirator 1 knew that this ingredient was not available; however, Unindicted Co-Conspirator 1 did not object when the pharmacy billed for these prescriptions anyway.

46.     During the conspiracy, when payments that overlap with other fraudulent activity are factored out, the co-conspirators received payments of approximately $37,512,992 from health care benefit programs for the drugs involved in this fraudulent activity. Based on a very conservative estimate, approximately 13% of these payments were for fraudulent prescriptions. As such, the co-conspirators were paid approximately $4,876,688.96 for this scheme for prescriptions that were fraudulently billed.

47.     At one point during the conspiracy, ROYAL CARE was audited with regard to DermacinRX Lexitral prescriptions. The audit determined that ROYAL CARE fell short on inventory of the drug when compared to what ROYAL CARE had billed to health care benefit programs, meaning that ROYAL CARE had not purchased enough of the product to fill all of the prescriptions it billed to the health care benefit programs.

48.     On or about February 15, 2016, the co-conspirators learned that ROYAL CARE was being audited by CVS CAREMARK ("CVS"), a PBM, due to drug inventory

discrepancies. In order to circumvent the audit, the co-conspirators submitted fake invoices, under the name McLean Family Pharmacy, to mask ROYAL CARE's drug shortages/discrepancies and to avoid a recoupment of funds. Specifically, AMIN submitted a letter to CVS, under the pseudonym Jack Ali ("ALI"), to attempt to conceal why there was a drug shortage at the pharmacy. AMIN also referenced the "McLean Family Pharmacy's invoice" in the letter.

49.     On or about June 2, 2017, the co-conspirators learned that EXPRESS SCRIPTS ("ESI"), another PBM, was making cuts to prescription reimbursements. As a result, the co-conspirators attempted to bill as many false claims to ESI as they could before the cuts occurred. The co-conspirators later learned that ESI was going to audit the pharmacy due to suspicions that many of the claims were fraudulent. The co-conspirators knew that pursuant to the audit, the pharmacy was likely to have to repay a significant amount of money. As such, the co-conspirators again utilized the fake McLean Family Pharmacy invoices to mask drug shortages/discrepancies and avoid a recoupment of funds. On or about August 23, 2017, ESI found that ROYAL CARE had a discrepancy amount of approximately $2,385,574.54. Red algae powder was among the drugs listed as having a shortage.

50.     As part of this audit, ESI requested ROYAL CARE produce specific prescriptions, several of which were written by Nurse-Midwife 1, which ESI deemed to be suspicious. ABDALLA could not locate many of these prescriptions. Accordingly, ABDALLA, AMIN, LAL, and Unindicted Co-Conspirator 1 worked together to create fraudulent copies of these prescriptions.

c. *Kickbacks for Prescriptions Billed to Private Health Care Benefit Programs*

51.     As discussed above, ABDALLA, AMIN, and WALKER engaged in a kickback

scheme to bill federal health care programs for prescriptions for the naloxone auto-injector device. Also, as discussed above, ABDALLA engaged in a kickback scheme with several doctors for multiple other drug prescriptions pursuant to a kickback arrangement. The co-conspirators also billed private health care programs, specifically CareFirst BlueCross/BlueShield ("CareFirst") and Anthem BlueCross/BlueShield ("Anthem"), for prescriptions the pharmacies were receiving pursuant to the kickback arrangement. In the contracts between Anthem and the prescribing providers it reads, "Provider represents and warrants that Provider does not give, provide, condone, or receive any incentives or kickbacks, monetary or otherwise, in exchange for the referral of a Member, and if a Claim for payment is attributable to an instance in which Provider provided or received an incentive or kickback in exchange for the referral, such Claim shall not be payable and, if paid in error, shall be refunded to Anthem." In the contracts between CareFirst and the prescribing providers it reads, "Group agrees not to accept any compensation in return for referring any Member to a provider for the furnishing of any item or service payable by Corporation. Group also agrees to refer Members to providers in accordance with applicable state law and the laws and regulations of the Medicare program."

52.     From in and around August 2016 to in and around February 2018, when payments that overlap with other fraudulent activity are excluded, CareFirst paid the pharmacies $5,643,440.00 for prescriptions for the naloxone auto-injector device and Anthem paid the pharmacies $2,500,709.00 for prescriptions for this naloxone auto-injector device pursuant to the kickback scheme. During this period, ROYAL CARE, MILLENNIUM, and GREAT FALLS were paid as if they dispensed 1,463 dual pack boxes of this naloxone auto-injector device, which were billed to CareFirst, and 550 dual pack boxes of this naloxone auto-injector device, which were billed to Anthem. The average retail cost of this naloxone auto-injector device during this

time was $3,762.65. Thus, ROYAL CARE, MILLENNIUM, and GREAT FALLS profited approximately $138,683.05 from prescriptions for this naloxone auto-injector device billed to CareFirst and $431,251.50 from prescriptions for this naloxone auto-injector device billed to Anthem.

### d. Fraudulent Billing for Embassy Employees

53.     From in and around February 2016 to in and around July 2016, ABDALLA and his co-conspirators, including AMIN and LAL, submitted claims on behalf of members of the Kuwait Embassy Health Plan for prescriptions that were never prescribed by a licensed physician. These drugs were listed as being prescribed by Doctor 2, when this was not in fact the case. The pharmacy was paid approximately $35,956.38 from Aetna, for these fraudulently submitted claims.

### e. Improper Elevation of Credentials to Fill Prescriptions

54.     To facilitate the goals of the health care fraud conspiracy, AMIN and LAL often fraudulently posed as pharmacists by elevating their title and credentials within RX30. For instance, AMIN and LAL elevated their credentials from pharmacy technician to pharmacist, a license neither of them held at the time in the Commonwealth of Virginia. AMIN and LAL used their elevated titles in RX30 to verify prescriptions, which were then submitted to health care benefit programs and pharmaceutical suppliers for payment. ABDALLA was the primary beneficiary of the conduct since he received almost all of the profits generated from these activities.

55.     Commonwealth of Virginia Code Section 54.1-3320(A)(6), requires that a pharmacist must perform "the verification of the accuracy of a completed prescription prior to dispensing the prescription."

56.     In contrast, Commonwealth of Virginia Code Section 54.1-3321, defines the following tasks that may be performed by a pharmacy technician:

    i.   The entry of prescription information and drug history into a data system or other record keeping system;

    ii.   The preparation of prescription labels or patient information;

    iii.   The removal of the drug to be dispensed from inventory;

    iv.   The counting, measuring, or compounding of the drug to be dispensed;

    v.   The packaging and labeling of the drug to be dispensed and the repackaging thereof;

    vi.   The stocking or loading of automated dispensing devices or other devices used in the dispensing process;

    vii.   The acceptance of refill authorization from a prescriber or his authorized agency, so long as there is no change to the original prescription; and

    viii.   The performance of any other task restricted to pharmacy technicians by the Board's regulations.

57.    From in and around November 2015 to in and around October 2017, health insurance benefit programs paid approximately $10,196,878 to the co-conspirators, as a result of AMIN and LAL fraudulently posing as pharmacists.

### f.  Fraudulent Use of Manufacturer Coupons

58.    From in and around December 2015 through in and around November 2017, ABDALLA and his co-conspirators, including AMIN and LAL, also enriched themselves by defrauding pharmaceutical companies and/or suppliers by causing the submission of false, fraudulent, and misleading claims for coupons intended to provide payment benefits/assistance to patients who needed certain pharmaceutical products. Pharmaceutical companies through pharmaceutical suppliers often distribute prescription co-payment coupons to offset patients' out-of-pocket costs for drugs. Specifically, the co-conspirators altered demographic information for manufacturer coupons even when a patient's health insurance provider was Medicare or Medicaid. The co-conspirators did this in order to make the patients appear eligible for these programs. The anti-kickback statute prohibits the use of pharmaceutical manufacturers' co-payment coupons when payment is also being sought in whole or in part under a federal health care program, including Medicare, Medicaid, or Tricare. In addition, the co-conspirators violated the

requirements of the coupon programs by failing to make patients pay any required co-payments for the drugs at issue. During the time period of the conspiracy, the co-conspirators were paid approximately $72,364,960 pursuant to these coupon programs. Based on a conservative estimate, approximately 13% of these payments were fraudulent and thus approximately $9,407,444.80 of these payments were made pursuant to the scheme to defraud the pharmaceutical suppliers.

59.    Additionally, the co-conspirators created false patients in the RX30 system in order to fraudulently obtain payment for ROYAL CARE pursuant to the coupon programs. During the time period of the conspiracy, the co-conspirators were paid approximately $677,827 for the fabricated patients in the RX30 system pursuant to these coupon programs. On or about June 15, 2018, ROYAL CARE received a letter from PHARMACEUTICAL SUPPLIER 1 that listed 15 prescriptions that were believed to be out of compliance with PHARMACEUTICAL SUPPLIER 1's coupon co-pay discount program. Ten prescriptions listed on the letter were for "Jack Ali" or Ali. As described above in paragraph 48, Ali was a pseudonym used by AMIN. Ali was also one of several fictitious patients created by and billed for by AMIN as described in the paragraph above.

60.    During the conspiracy, ABDALLA, AMIN, LAL, Unindicted Co-Conspirator 1, and other co-conspirators agreed and understood that claims containing false and fraudulent information would be submitted to health insurance benefit programs and pharmaceutical suppliers. The false claims ultimately submitted to health insurance benefit programs included misrepresentations about the prescribing doctor and/or medical necessity.

61.    The parties agree that total losses to the United States and private insurers pursuant to the health care fraud schemes were between $3,500,000 and $9,500,000.

## IV.    Conclusion

62.    The acts described above were done willfully and knowingly and with

specific intent to violate the law, and not by accident, mistake, inadvertence, or other reason.

63.     This Statement of Facts does not contain each and every fact known to ABDALLA and to the United States concerning ABDALLA's and his co-conspirators', including AMIN's, LAL's, Unindicted Co-Conspirator 1's, WALKER's, ████ and MYERS's involvement in the charges set forth in the plea agreement.

64.     This Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against ABDALLA regardless of whether the plea agreement is presented to or accepted by the Court. Moreover, ABDALLA waives any rights that he may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 401, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.


                          Respectfully submitted,

                          G. Zachary Terwilliger
                          United States Attorney



                          Monika Moore
                          Carina A. Cuellar
                          Assistant United States Attorneys

Date: November 9, 2020

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MOHAMED ABDALLA, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____

MOHAMED ABDALLA


I am the defendant's attorney.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____

Timothy D. Belevetz, Esq.
Attorney for MOHAMED ABDALLA

25