IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 1:20-cr-250 |
| v. ) | |
| ) | |
| MOHAMED ABDALLA, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S POSITION ON SENTENCING**

Defendant Mohamed Abdalla, by and through counsel, hereby submits this memorandum in aid of sentencing.

**INTRODUCTION**

Mr. Abdalla, a pharmacist, worked with others to pay kickbacks in exchange for patient referrals and to defraud health care benefit programs. He recognizes the serious nature of the offenses he has committed and accepts complete responsibility for his actions. Mr. Abdalla has been devoted to making amends for his actions by owning up to what he did; cooperating with government's ongoing investigation, including making himself available for numerous extensive proffer sessions over the last three years; and pleading guilty. He has also spent a considerable amount of time reflecting on his conduct, including the harm it caused to victims and the pain it has brought to his family, and mapping out a plan for the future.

Mr. Abdalla is genuinely remorseful for what he did and acknowledges that some period of incarceration is appropriate. He respectfully requests that the Court take into account the nature of the offense as well as his demonstrated contrition, background, character, extensive cooperation, and plans for the future in imposing a sentence of 44 months imprisonment.

## **BACKGROUND**

Mr. Abdalla's Family and Career

As noted in the presentence report ("PSR"), Mr. Abdalla was born in Sudan in 1972. Presentence Report ("PSR") at 3. He is one of seven children born to a mother and father who remained in Sudan. *Id.* ¶ 114. Mr. Abdalla's childhood in an unstable and impoverished part of the world was made even more challenging by a callous father who saw fit to raise his children by way of verbal and physical abuse.

At the age of 19, Mr. Abdalla immigrated to the United States, settling in New York, where his older brother Khidir was a student. Eager to begin a new life and determined to make the most of the opportunity do so, he worked long hours to support himself and took classes at City College of New York. After discovering an interest in pharmacy, he enrolled at the Albany College of Pharmacy and Health Sciences, from which he received a Bachelor of Science in Pharmacy in 2001. *Id.* ¶ 127.

Following graduation, Mr. Abdalla began his career in Florida (*id.* ¶ 137), where he quickly became the youngest pharmacy manager within Walgreens in Miami. He continued his pharmacy practice in Orlando, serving as the pharmacy manager of a Walgreens located near two major medical facilities, the Orlando Regional Medical Center and the MD Anderson Cancer Center.

In 2008, Mr. Abdalla moved to Northern Virginia, specializing in compounding pharmacy, the practice of making drugs prescribed for specific patients with needs that cannot be met by commercially available medications. He initially worked for a specialty pharmacy in Fairfax and then, beginning in 2010, opened his own compounding pharmacies—MedEx Pharmacy, MedEx Health Pharmacy, and Royal Care Pharmacy. *Id.* ¶¶ 136, 137.

In 2009, Mr. Abdalla married Carla Espinal, a single mother with one child, now 24, whom he raised as his own son along with another son, age 12, born to Carla and him.  *Id.* ¶ 121. As Carla noted in her letter to the Court (Exhibit ("Ex.") 1), Mr. Abdalla is the head of their close-knit household.

Offense Conduct and Cooperation

From 2014 through November 2018, while maintaining a busy pharmacy practice that provided personalized service to tens of thousands of individuals in need of medication, some made by manufacturers and some custom made to meet the unique requirements or specific patients, Mr. Abdalla worked with others to violate the Anti-Kickback Statute and commit health care fraud.  While the PSR accurately describes the offense conduct, the Statements of Facts (Dkt. No. 8) goes into greater detail.  The length and comprehensiveness of those facts reflect the extensive and full cooperation Mr. Abdalla has provided to the government for the last three years.  From his first meeting with the government in April 2018 through the most recent, he has admitted his guilt, provided a complete account of his involvement in the offense and that of others, and remained committed to cooperating in every way he has been asked.

**POSITION ON PRESENTENCE REPORT AND CALCULATED GUIDELINES**

On November 9, 2020, Mr. Abdalla waived indictment and pled guilty to a two-count criminal information charging him with conspiracy to violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371 and conspiracy to commit health care fraud in violation of 18 U.S.C. § 1347.  Under the terms of the written plea agreement (Dkt. No. 7), the government and Mr. Abdalla agreed to recommend the application of the following United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") provisions:

- With respect to Count 1 (Conspiracy to Violation the Anti-Kickback Statute),

    - a base offense level of 8, pursuant to U.S.S.G. § 2B4.1;

    - an 18-level increase based on the value of the improper benefit conferred of more than $3.5 million but not more than $9.5 million, pursuant to U.S.S.G. §§ 2B4.1 (b)(1)(J) and 2B1.1(b)(1)(K); and

    - a two-level leader/organizer enhancement, pursuant to U.S.S.G. § 3B1.1.

- With respect to Count 2 (Health Care Fraud Conspiracy),

    - a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(1);

    - an 18-level increase based on a loss amount of more than $3.5 million but not more than $9.5 million, pursuant to U.S.S.G. §§ 2B4.1 (b)(1)(J);

    - a two-level sophisticated means enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10)(C); and

    - a two-level leader/organizer enhancement, pursuant to U.S.S.G. § 3B1.1.

In the plea agreement, the government also stated that "[i]f the defendant qualifies for a two-level decrease in offense level pursuant to USSG §3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to" move for "an additional one-level decrease in the defendant's offense level." Dkt. No. 7 at 4-5.

In its position on sentencing (Dkt. No. 15), the government has advocated for a two-level enhancement for the abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3, to which Mr. Abdalla does not object.

Thus, a Guidelines calculation consistent with the recommendations and agreements contained in the plea agreement, along with the government's recommendation in its sentencing

memo, results in a total offense level of 27, with a corresponding advisory range of 70 to 87 months in prison.

The PSR sets forth a substantially different Guidelines range. First, after grouping the two counts and using Count 2 to calculate the offense level, the PSR recommends a base offense of 6, the imposition of a 20-level increase for a loss amount of more than $9.5 million but not more than $25 million, a two-level enhancement for a health care offense involving a loss of more than $1 million to a federal health care program, a two-level sophisticated means enhancement, a two-level enhancement for the abuse of a position of trust, a four-level leader/organizer enhancement, and a three-level reduction for the timely acceptance of responsibility. PSR at 24-25. This PSR calculates the adjusted offense level at 33 with a corresponding advisory sentencing range of 135 to 168 months.

As noted above, with regard to the loss amount, both the government and Mr. Abdalla have agreed to recommend a loss amount of more than $3.5 million but not more than $9.5 million. With regard to the role adjustment, the parties have agreed to recommend a two-level, rather than a four-level, leader/organizer enhancement. In addition, as the government stated in its sentencing memo, in negotiating this deal, the parties' intention was that the government would not recommend an additional two-level enhancement based on a loss to federal health benefit program of more than $1 million.

Mr. Abdalla asks that the Court give significant weight to the parties' agreement with respect to the application of the sentencing guidelines. The agreement was an important factor in his decision to accept the deal the government offered. The Court's willingness to give considerable weight to this agreement when imposing a sentence will provide the government and defendants a measure of confidence that sentencing courts will attach significance to their

5

negotiated agreements. Joint recommendations like these, even when non-binding, typically help resolve cases in a way that conserves government and judicial resources alike.

Accordingly, Mr. Abdalla asks this Court to find that the appropriate advisory Guidelines range is 70 to 87 months.

## SENTENCING ARGUMENT

Mr. Abdalla fully recognizes the gravity of his offenses. He is genuinely remorseful for his contribution to the harm the offense caused to the victim health care benefit programs and understands that a term of incarceration is appropriate.

Mr. Abdalla is a first-time offender with a long history of making positive contributions to his patient-customers, his family, and his community. As the record before the Court makes clear, the offense conduct was entirely out of character for Mr. Abdalla, a fact the Court should take into account in crafting a just sentence. *See United States v. Smith*, 275 F. App'x 184, 186 (4th Cir. 2008) (sentence significantly below the guidelines range was not an abuse of discretion where defendant had "lived an exemplary life to this point . . . full of noteworthy activities") (internal quotation marks omitted).

## SECTION 3553(a) FACTORS

As this Court is aware, sentencing courts must take into account the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth therein, that is,

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

>(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) directs courts to consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory sentencing purposes reflected above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

Nature and Circumstances of the Offense and Defendant's History and Characteristics

Paying kickbacks to obtain patient-customers and filing fraudulent health insurance claims are serious offenses. This conduct interferes with consumer choices based on merit and value and causes health insurance providers to pay more for claims—or even pay for products that were not medically necessary—thereby resulting in higher costs for health care. Mr. Abdalla fully appreciates this.

Mr. Abdalla has otherwise led an exemplary life, both professionally and personally. He overcame great odds, leaving behind a failed state in Sudan with limited opportunities for success. With little more than a drive to excel, he came to this country, obtained an education, and became a productive and high-functioning member of society.

Unfortunately, after many years of advancement in his career, Mr. Abdalla succumbed to an element of greed that him led to break the rules. He wanted to continue to provide specialized and high-quality service to his patient-customers but also aspired to more income. There are two key factors, however, it is important to consider.

First, with respect to the kickback scheme, while Mr. Abdalla willingly entered into the arrangement, he was not the initiator. As reflected in the statement of facts, it was a co-conspirator who approached Mr. Abdalla in late 2013 to inquire whether he would be interested in taking part in an agreement in which the co-conspirator would refer prescriptions to Mr. Abdalla's pharmacy in exchange for a portion of the proceeds. Dkt. No. 8, ¶ 21. Similarly, another co-conspirator identified in the statement of facts as "Doctor 1" solicited Mr. Abdalla for kickbacks in exchange for referring all of Doctor 1's medical practice's patients to Mr. Abdalla's pharmacy. *Id.*, ¶ 36. Consistent with the all-too-common practice of recruiting pharmacists to pay kickbacks for prescriptions, in 2018, an associate of Doctor 1's, identified in the statement of facts only as another doctor, solicited Mr. Abdalla to take part in a similar arrangement, which never materialized. *Id.*, ¶ 38.

Second, although Mr. Abdalla was an active participant in the charged offenses, he did not manage, nor was he even directly involved in, parts of the conduct. As the government noted in its sentencing memorandum, at times, Mr. Abdalla's employees engaged in conduct on their own initiative. Dkt. No. 15 at 8.

Mr. Abdalla has no criminal history. Apart from the aberrant conduct at issue in this case, he has led a law-abiding life. He has led a productive life. Mr. Abdalla started with a life that had given him little and developed a successful pharmacy practice. He is good at what he does, and he is compassionate. Patient-customers, family members, and friends provide insight into the manner in which Mr. Abdalla consistently treats others.

Throughout Mr. Abdalla's adult life, he has been committed to giving back to the community. As Rachel Sullivan, who has known him for nearly 20 years, put it he "is a man who truly cares about the world around him." Ex. 2 (letter from Rachel Sullivan). That quality

8

is reflected in range of charitable efforts he has undertaken.  Earlier in his career, he established Sunday clinics at churches in the Orlando area, donated his earnings from a medical examiner reality television show to a shelter for abused women, and partnered with the Orlando Medical Center to  deliver prescriptions to hospital patients prior to their discharge to increase the likelihood they would receive and take their medication.  Ex. 3 (letter from Leslie Pemberton).  After relocating to Northern Virginia, Mr. Abdalla has served as a board member of, and provided financial support to, the Loudoun Abused Women's Shelter; regularly taken part in food drives to feed the homeless in Washington, and sponsored Inova HIV patients to provide holiday gifts.  Ex. 4 (letter from Angela McCall).

Mr. Abdalla is a compassionate pharmacist devoted to the health of his customer-patients.  Ms. Sullivan observes "his respect for others and professionalism is unrivaled."  Ex. 2 (letter from Rachel Sullivan).  Maria MacBride points to his "devotion" and "desire to help" and describes him as "a great asset to our community."  Ex. 5 (letter from Maria MacBride).

Far from the conniving predator co-defendant and former employee Onkur Lal has tried to portray him as, Mr. Abdalla is universally recognized—at least by those that do not have a motive to deflect blame—as a caring family member and friend.  When he first arrived in the U.S. as a teenager, Mr. Abdalla immediately set out to support his older brother Khidir, then an architecture student.  "In my last two years in college he worked seven days a week in order to support me financially and paid all my living expenses until I graduated from college.  Without him I could not have obtained my college degree in Architecture."  Ex. 6 (letter from Khidir Abdalla).  As a father, Mr. Abdalla provided the same support for his son Brian, who described him as "generous, kind, [and] hardworking" and someone who "always puts his family first."

9

Ex. 7 (letter from Brian Espinal). His wife Carla perhaps sums it up best. "There is no doubt Mohamed is the backbone, and the very foundation of our family." Ex. 1.

His devotion to family has not been limited to his immediate relatives. His nephew, Alex Crespo, notes that after he lost his father, "it was my Uncle Mo who I gravitated towards because of his positive influence. He never judged me or turned me away. He lent me his unwavering support during a time in my life where I did not know what it was that I needed." Ex. 8 (letter from Alex Crespo). His mother-in-law Lucy Valladares notes that after her niece recently lost her 22-year old son, Mr. Abdalla "immediately offered to assist with any medical bills and funeral expenses." Ex. 9 (letter form Lucy Valladares).

Mr. Abdalla's kindheartedness extends to friends as well. Terrence Allen, who has known Mr. Abdalla for more than 10 years, refers to Mr. Abdalla as a "big brother" who "has always been the type of person to help any one [sic] out in any way he can." Ex. 10 (letter from Terrence Allen). By way of an example, Mr. Allen describes the assistance Mr. Abdalla provided after Mr. Allen left his employment at Walgreens to enroll at George Mason University:

> My senior year at GMU my family and I fell on hard times financially. Mo knew things were getting tough for us and helped us make our monthly rent payment and childcare payments, until I was able to [g]raduate. Without Mo[']s support and encouragement along the way, I would not have made it this far.

*Id.*

Statutory Purposes of Sentencing

Conspiring to pay kickbacks and conspiring to commit health care fraud are serious offenses. A term of incarceration of 44 months reflects the severity of the crime. For an individual like Mr. Abdalla, that is, a first-time offender who recognizes what he did was wrong, who has taken responsibility for his actions, who has otherwise led an honorable life, and who

10

intends to make the most of the rest of his life, a 44-month sentence will promote enormous respect for the law and provide just punishment.

A sentence of 44 months will also afford adequate deterrence, both general and specific. Such a sentence is a significant amount of time to be away from loved ones and unable to make a positive contribution to society. It also takes into account Mr. Abdalla's more extensive level of culpability relative to that of co-defendant Onku Lal, who this Court sentenced to 36 months imprisonment. With regard to specific deterrence, there is no need to protect the public from further crimes committed by Mr. Abdalla as the record strongly suggests he will never engage in this type of conduct in the future. It goes without saying that he has learned his lesson and learned it well.

Kinds of Sentences Available

Because neither 18 U.S.C. § 371 nor 18 U.S.C. § 1347 include a statutory minimum, this Court may impose a sentence of 44 months in prison.

Kinds of Sentences and Sentencing Range Set Forth in the Guidelines

As discussed in above, Mr. Abdalla requests that the Court give considerable weight to the negotiated Guidelines recommendations reflected in the plea agreement. Accordingly, the offense level should be 27, which corresponds to a sentencing range of 70 to 87 months. Given that the sentencing guidelines are advisory, *United States v. Booker*, 543 U.S. 220 (2005), however, the Court is free to craft a sentence outside that range. In carrying out its obligation to "make an individualized assessment based on the facts presented," a sentencing court may deviate from the guidelines based on policy considerations or because the guidelines fail to reflect the § 3553(a) factors. *United States v. Mondragon-Santiago*, 564 F.3d 357, 360 (5th Cir. 2009).

Sentencing Guidelines Policy Statements

The guidelines policy statements refer to the need for just punishment. The introductory chapter, for example, outlines the basic purposes of criminal punishment that supported the guidelines' creation. Included among those purposes is just punishment. USSG, Ch. 1, Part A (Introduction and Authority). Mr. Abdalla respectfully submits that the totality of circumstances in this case suggest that a below-guidelines sentence would be just punishment.

Avoidance of Unwarranted Sentencing Disparities

A term of incarceration of 44 months is consistent with the Court's recent sentence of Michael Beatty, a pharmacist convicted of conspiracy to violate the Anti-Kickback Statute. The Court sentenced Mr. Beatty, another pharmacist recruited by co-defendant Seth Myers and a doctor involved in the conspiracy with Mr. Abdalla, to term of incarceration of one year and a day. A sentence of 44 months would appropriately take into account Mr. Abdalla's more extensive involvement in the offense conduct without leading to a disproportionate sentence.

Need to Provide Restitution to Victims of the Offense

Mr. Abdalla recognizes he will owe restitution to the victims of the offense. Given his high income potential, a sentence substantially below the guidelines will permit Mr. Abdalla more quickly to begin making victims whole.

After serving his sentence, Mr. Abdalla intends to continue making positive contributions to society by pursuing a new career in construction management, an effort he has already begun by earning a Construction Management Certification from the Northern Virginia Community College.

## **CONCLUSION**

Mr. Abdalla recognizes he broke the law. He is remorseful and wants to make amends for what he did. He has accepted responsibility for his conduct and has been working with the government by participating in numerous extensive proffer sessions over the course of the last three years. He is a man of strong character who wants to return to raising his young son and supporting his wife and to continue to do be a productive member of the community. For the reasons set forth above and those to be presented at the sentencing hearing, Mr. Abdalla respectfully asks the Court to impose a sentence of 44 months imprisonment.

Respectfully submitted,

By:     /s/
Timothy D. Belevetz
Ice Miller LLP
200 Massachusetts Avenue, N.W., Suite 400
Washington, DC 20001
Tel: (202) 572-1605
timothy.belevetz@icemiller.com

*Counsel for Defendant Mohamed Abdalla*

**CERTIFICATE OF SERVICE**

  I certify that on this 15th day of March 2021, I caused the foregoing to be filed electronically using the Court's CM/ECF system, which sends a notification of such filing to:

Monika Moore
Carina A. Cuellar
Assistant U.S. Attorneys
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
monika.moore@usdoj.gov
carina.cuellar@usdoj.gov

*Counsel for the United States*

               /s/
             Timothy D. Belevetz
             Ice Miller LLP
             200 Massachusetts Avenue, N.W., Suite 400
             Washington, DC 20001
             Tel: (202) 572-1605
             timothy.belevetz@icemiller.com